**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

LASIEKA JAUWANE LEE,     :

  Petitioner,      :
             CIVIL ACTION NO. 20-0221-KD-MU
            :
vs.           CRIMINAL NO. 17-0246-KD-MU
            :
UNITED STATES OF AMERICA,
            :
  Respondent.

## REPORT AND RECOMMENDATION

  This cause is before the Court on Petitioner Lasieka Jauwane Lee's motion to vacate, set aside or correct his sentence pursuant to 28 U.S.C. § 2255 (Doc. 80). This matter came on for an evidentiary hearing on November 5, 2020. Following consideration of all relevant testimony and pleadings in this case, including all post-hearing briefs (*see* Docs. 110-12), and pursuant to 28 U.S.C. § 636(b)(1)(B) and General Local Rule 72(a)(2)(R), the undersigned **RECOMMENDS** that the Court **DENY** Lee's § 2255 motion.

## FINDINGS OF FACT

  On November 15, 2017, Lee was indicted on one count of conspiracy to possess with intent to distribute more than 50 grams of methamphetamine, 21 U.S.C. § 846 (Count Two), and three counts of possession with intent to distribute cocaine (Count One) or methamphetamine (Counts Three and Four), 21 U.S.C. § 841(a)(1). (*See* Doc. 1).

On October 30, 2018, Criminal Justice Act counsel (Domingo Soto) was appointed to represent Lee (Doc. 8); she pleaded not guilty at arraignment and was released from custody on conditions (*see* Docs. 9 & 10). A guilty plea hearing had been set for December 20, 2018 (*see* Doc. 19) but was cancelled when new counsel appeared for Lee (*see* Doc. 23). Lee fired Dom Soto purportedly because of his unwillingness to review with her discovery supplied by the Government (Doc. 107, PageID. 414), and retained White on December 18, 2018 (*compare* Doc. 107, PageID. 440 (White met with Lee and her mother on December 18, 2018 and was retained) *with* Government's Exhibit 1 (sign-up sheet reflecting that Lee met with White on December 18, 2018); *see also* Doc. 20 (Soto's December 19, 2018 motion to withdraw, which advised that he had been terminated by Lee and that the Defendant had hired retained counsel; Soto further advised that both Lee and retained counsel would appear at the court setting on December 20, 2018)).[1] White, who has practiced law since 1988 and has focused on criminal defense since 1992 (Doc. 107, PageID. 437),[2] received all discovery from Lee's appointed attorney, Dom Soto, in court on December 20, 2018

---

[1]     According to White, when he first met Lee on December 18, 2018, she wanted to proceed to trial. (Doc. 107, PageID. 440). "Her position was that her husband who is now deceased that was involved in these activities with her had basically forced her to do what the indictments allege at gunpoint." (*Id.,* PageID. 440-41). So, coercion was going to be White's defense; he did not know if he could "sell" that to a jury but he was willing to try to convince a jury that Lee's husband coerced her. (*See id.* at 441). At this first meeting, White also "strongly urged [Lee] to consider pleading." (*Id.*).

[2]     The majority of White's criminal defense work is in state court. (*Id.,* PageID. 438). Before this case, White had never been accused by a federal court client of providing ineffective assistance of counsel and if such an allegation had been lodged in state court, it was only one time. (*Id.*). No court, however, has ever concluded that White's performance was deficient. (*Id.*).

(*see id.*, PageID. 447). Lee's case was continued to the February 2019 term of court (*see* Doc. 23), with a pretrial hearing being set for January 8, 2019 (*see* Doc. 24).

Lee testified that when she first met White, he told her that they "could fight it or that [they] could sign the plea." (Doc. 107, PageID. 415). According to Lee, she never planned to go to trial to fight the charges and, instead, knew all along that she was going to plead guilty because she was aware of what she had done. (*See id.*). As reflected above, however, White testified at the evidentiary hearing that Lee wanted to go to trial on December 18, 2018, because it was her position that her husband had forced her to perform the actions alleged in the Indictment. (*See* Doc. 107, PageID. 440-41). White's advice to Lee was to consider a plea but that he would try the case if that was what she wanted to do. (*See id.,* PageID. 441).

White alone attended the January 8, 2019 pretrial hearing, informing the undersigned that the case could not be settled and would have to be tried (*compare* Doc. 25 *with* Doc. 107, PageID. 450-51 (White's testimony that if the records in the case show this is what happened, the records are correct and, further, that he announced that the case would be tried because that was her position at that time)); at the undersigned's suggestion, however, a follow-up pretrial conference was set for January 11, 2019 (*compare* Doc. 25 *with* Doc. 107, PageID. 452). Both White and Lee attended the follow-up pretrial conference on January 11, 2019, during which the parties agree the following occurred:

> White told Magistrate Murray that "we just discovered" from USPO Mark
> Seibert that "there's a possibility [Lee] does [qualify for safety valve relief]"

based on a provision of the recently-enacted First Step Act[3].[4] But, White noted, Lee would still have to "be truthful with the . . . forthright and truthful with the government. And I guess we're going to need time to do that too. I don't know.

The Court remarked that, if the "only issue" concerning the safety valve was whether Lee would satisfy the last prong by truthfully disclosing complete information to the United States, it could set her plea for later in the month. The prosecutor made clear that the United States does not "ordinarily pursue interviews before a guilty plea" because of the possibility that "something falls through," requiring a trial. Instead, the prosecutor pointed out that Lee would have "up until the date of sentencing" to provide truthful and complete information in order to qualify for the safety valve.

White said he was "okay" with proceeding in that way [] and the prosecutor added, "So if – if she's willing to sign the plea offer, I think we can go ahead and get it set for a plea and then get – it would take its normal course. After the plea we could set up the interview, and then we can take as long as we need to for sentencing."

The lawyers also discussed with the Magistrate the issue of Lee's continued release on conditions once she pled guilty. The prosecutor agreed that ". . . although this is a mandatory detention case, we are amendable to the exceptional circumstances, given the defendant's agreement to attempt to cooperate with the government. So we would ask for her to remain under [release] conditions." The Magistrate affirmed that "I will absolutely accept that [the prosecutor's position on release] at that point [after taking the plea] as a basis for her to remain on conditions."

---

[3]      The First Step Act was enacted on December 21, 2018. *See, e.g., United States v. Garcia,* 2019 WL 7503482, *1 (11th Cir. July 9, 2019). The First Step Act expanded application of the safety valve.

[4]      Lee remembers another gentleman explaining the safety valve and the First Step Act to her attorney, John White (Doc. 107, PageID. 405) and also remembers that when she heard about the safety valve she wanted "to do it." (*Id.,* PageID. 416 ("If it just takes me to tell the truth, I want to do it.")). Lee later admitted that White did tell her, during the meeting with Seibert, that she had to be truthful with the government about her crimes. (*See id.,* PageID. 406).

(Doc. 104, PageID. 385-86 (internal citations omitted; footnotes added); *see also* Doc. 90, PageID. 317-22). White testified at the evidentiary hearing that despite talking with Lee about a plea and despite his knowledge on this date that Lee was eligible for safety valve relief, Lee remained resolute that she wanted to try the case in early January. (Doc. 107, PageID. 442-43; *see also id.,* PageID. 442 ("[W]e still talked about a plea, but her position [in early January] was to try the case.")).

Two days before the change-of-plea date, on January 23, 2019, Lee went to John White's office to review the discovery,[5] which consisted of video surveillance produced by the Government. (*Compare* Doc. 107, PageID. 426 *with id.,* PageID. 405 & 417 (Lee's testimony regarding her review of discovery/evidence); *see also* Government's Exhibit 2 (sign-in sheet produced by White reflecting that Lee signed-in at his office on January 23, 2019)). Lee reviewed the discovery with White's legal assistant, Zoe Steadham. (*Id.,* PageID. 426-27; *see also id.,* PageID. 444). At the tail-end of that review, White appeared at his office and spoke with Lee about her plea and safety valve relief (*compare* Doc. 107, PageID. 427-28 *with id.,* PageID. 444-45; *but cf. id.,* PageID. 417 (Lee's testimony that White did not discuss safety valve relief with her after she reviewed the discovery in her case)). On that date, for the first time, Lee advised White that she was going to plead guilty, her position having changed after she saw herself on videotape. (*Id.,* PageID. 444). Both White and Steadham testified that

---

[5]     White's assistant Zoe Steadham called Lee, on White's instructions, and asked her to come into the office on January 23, 2019. (*See* Doc. 107, PageID. 426). White wanted Lee in the office because her change-of-plea date was two days away, she was still on the fence regarding her plea, and she had never seen the video-surveillance discovery produced by the government. (*See id.,* PageID. 443).

White informed Lee that in order to qualify for safety valve relief, she had to lay all her cards on the table with respect to everything she was in trouble for including information related to the involvement of anyone else (*compare id.,* PageID. 445 (White's testimony[6]) *with id.,* PageID. 427-28 (Steadham's testimony)). Indeed, White told Lee that the only avenue for her to chart to avoid the statutory minimum mandatory was to opt for safety valve relief and divulge all information. (*Id.,* PageID. 445; *see also id.,* PageID. 428 (Steadham did not recall Lee saying very much of anything but did recall White telling Lee that he could not pick for her, 60 months or safety valve)). Both White and Steadham also recalled that when Lee started saying she did not want to divulge any information, White told Lee to sleep on it and advise him of her decision the following day. (*Compare id.*, PageID. 428 *with id.,* PageID. 445). Lee called White's office on January 24, 2019, saying she wanted to talk before Court the following day. (*Compare id.,* PageID. 445 *with* Government's Exhibit 3). During that meeting, before the change-of-plea, Lee advised White that her position regarding safety valve (expressed two days earlier) had not changed (*id.,* 445-46), though she understood "she was getting the 60 months unless [she gave truthful information under the safety valve provision]." (*Id.,* PageID. 455).

On January 25, 2019, Lee entered a counseled guilty plea to Count 4 of the indictment (*see* Doc. 75), pursuant to a plea agreement (*see* Doc. 34), which she

---

[6]     White clearly understood that for a defendant to qualify for safety valve relief and receive a sentenced below a statutory minimum, she would have to satisfy numerous requirements, including the full disclosure of information about her crimes to the government. (*See* Doc. 107, PageID. 438 & 439). Indeed, White had represented clients in federal court who qualified for safety valve relief before he represented Lee. (*See id.*).

agreed during the evidentiary hearing bore her signature (*see* Doc. 107, PageID. 418).[7] Lee's plea agreement did not include provisions specifically relating to cooperation with the United States. (*See* Doc. 34). In the factual resume attached to the plea agreement, Lee admitted the factual basis for her plea, which included events in 2012 relating to Count One of the Indictment, charging her with possession with intent to distribute 172.92 grams of cocaine (*compare* Doc. 34, PageID. 78-79 *with* Doc. 1, PageID. 1) and admitted to methamphetamine-related conduct from 2017, relevant to Counts 2-4 of the Indictment, and to being accountable for 91.5 grams of methamphetamine. (Doc. 34, PageID. 79-81).

During the course of her guilty plea proceeding on January 25, 2019, there was some confusion regarding the count to which Lee was pleading (*see* Doc. 75, PageID. 213-15); ultimately, however, that confusion was cleared up and Lee agreed that she had reviewed the amended and updated plea agreement with her attorney and understood the terms of the agreement (*id.,* PageID. 215; *see id.* at PageID. 210-11 (Lee advised that she was satisfied with the counsel, representation and advice of her attorney, John White); *compare id. with* Doc. 107, PageID. 418-19 (Lee agreed that when she signed the plea agreement, she understood all of her rights with respect to the charged offense, had read every part of the plea agreement and carefully reviewed it with her attorney, and was satisfied with White's legal advice and believed he had represented her "faithfully, skillfully, and diligently")). In particular, Lee informed the

---

[7] Lee testified that she discussed the safety valve with White before the change-of-plea hearing. (Doc. 107, PageID. 418).

Court that she understood the maximum penalties with respect to a plea of guilty to Count 4 included a statutory minimum mandatory of 5 years to 40-years' imprisonment (Doc. 75, PageID. 215-16) and, as well, she understood all implications for sentencing (*see id.,* PageID. 216-17 (acknowledging her understanding that the guideline sentencing range could not be calculated until her PSI was authored, that the guidelines provide for upward and downward departures, and that the guidelines are advisory and do not necessarily control the sentence imposed)). Lee was further advised by the Court that she would be asked to give information for the presentence report, a meeting during which her lawyer could be present if she so desired, and that she and her attorney would be allowed to read the PSI and file any objections thereto before the sentencing hearing. (*Id.,* PageID. 221).

At the conclusion of the change of plea hearing, the Court heard from the parties regarding whether Lee should be detained or remain on conditions of release and after some discussion, the Magistrate Judge indicated that he would recommend that Lee remain on her conditions of release. (*See id.,* PageID. 222-24). Indeed, during the exchange the Government explicitly stated that "the defendant's agreement to cooperate with the Government establishes circumstances that would allow her to remain under conditions[]" (*id.,* PageID. 222) and defense counsel specifically informed the undersigned that the parties had "talked." (*Id.,* PageID. 223). Therefore, in accordance with the undersigned's statements during the guilty plea proceeding (*id.,* PageID. 223 ("If there is a mandatory detention provision, I will do whatever I need to do to make sure [Judge DuBose] understands that this is the circumstance.")), the

undersigned's report on the guilty plea further "recommend[ed] that, upon adjudication of guilt, Defendant Lee be allowed to remain on conditions of release pending sentencing because, as the Government stated, exceptional circumstances in the form of continued active cooperation exist to justify her continued release." (Doc. 36). According to White, however, Lee knew when they left the guilty plea proceeding that "60 months were coming [her way] without the safety valve." (Doc. 107, PageID. 446)

Two days after changing her plea, on January 27, 2019, Lee was arrested in Escambia County, Florida and charged with DUI and operating a motor vehicle while her driver's license was suspended (*see* Doc. 37, PageID. 84-85). Lee failed to report this arrest to her pretrial services officer (*see id.,* PageID. 85).[8] During the course of the February 12, 2019 bond revocation hearing, the prosecution advocated for Lee's detention, arguing that her arrest would impact her "viability as a credible witness" (Doc. 91, PageID. 329; *see also id.* ("So the ramifications of this arrest and ongoing criminal conduct are huge for this defendant. And the government is not able to turn a blind eye to this ongoing criminal conduct and we request that the Court revoke the conditions that were previously imposed.")). Lee's attorney, conversely, argued that his client should be continued on release conditions, albeit stricter conditions. (*Id.,* PageID. 330).

> I will say one thing in addition before – he can look and get them [conditions of release] probably a lot quicker than I can. But one thing is – probably there's no guarantees, I know. There's a good shot that she was

---

[8]     Lee's mother called White's office on February 4, 2019, advising that she had been arrested in Pensacola and had bonded out of jail. (*See* Government's Exhibit 3). And later, on February 11, 2019, Lee called White's office to remind them of the hearing scheduled in federal court on February 12, 2019. (*Compare id. with* Doc. 107, PageID. 433).

going to be eligible for the safety valve, I think.[9] And the government's right; this is going to have an impact on it. Because she's got to be forthright with them and truthful with them and this is going to have an impact.

But so the Court knows, her record is pretty petty stuff, it's no violence in her record. Petty stuff. And I think that she was going to be a good, good candidate possibly for safety valve. I'm just asking you to figure out some other stricter rules that she's got to follow.

(Doc. 91, PageID. 330). And the Magistrate Judge hearing the presentations found that Lee should remain on release with additional conditions (*see id.,* PageID. 333); however, the order of the Magistrate Judge was stayed for 24 hours so that the United States could appeal the order to the district judge. (*See id.,* PageID. 334; *compare id. with* Doc. 43 (notice of appeal)).

On February 13, 2019, the District Court entered two orders; the first order accepted Lee's plea of guilty of Count 4 of the Indictment, pursuant to the Magistrate Judge's report and recommendation, and adjudged her guilty of that offense (Doc. 44),

---

[9]     Despite making this comment to the Court, White testified at the evidentiary hearing that he had already tried persuading her to opt for safety valve relief on several occasions and was "done" with trying to "sell [safety valve] to her again[]" because "[s]he knew what she had to do and she wasn't going to do it, in [his] mind." (Doc. 107, PageID. 469). In particular, White stated that after the bond revocation hearing Lee insisted she was not going to disclose any information to the government. (*See id.,* PageID. 458). White also explained that he did not tell the government at this point in time that Lee was not going disclose relevant information because he wanted to keep "the door open." (*Id.,* PageID. 471).

To be sure, White executed an affidavit on June 29, 2020, in which he swore that he "did not communicate with Ms. Lee about cooperating again after she entered her plea of guilty." (Doc. 89, PageID. 314). However, given White's on-the-record comments during the bond revocation hearing, the undersigned regards as more credible White's evidentiary hearing testimony that after the bond revocation hearing the two spoke and Lee maintained that she was not going to divulge any information to the government. And, finally, the undersigned stresses that White's thinking in regard to Lee's position on disclosing information was confirmed on her sentencing date. (*See* Doc. 107, PageID. 469 ("[S]he still wasn't going to do it."); *cf. id.,* PageID. 462 ("But I know what she was thinking the morning of the sentencing.")).

and the second revoked Lee's pretrial release status in light of her conviction (*see* Doc. 45).

Lee was detained in the Monroe County Jail from February 12, 2019 through sentencing on August 9, 2019. The parties agree that during this entire time (save for February 12, 2019, the date of the bond revocation hearing), White did not visit Lee in jail nor did he correspond or otherwise communicate with her while she was incarcerated in the Monroe County Jail (Doc. 104, PageID. 389; *see* Doc. 107, PageID. 404-07 (Lee's testimony that between her revocation of bond hearing in February of 2019 and her sentencing on August 9, 2019, she never saw White nor did he communicate with her); *id.,* PageID. 433 (Steadham's testimony that she knew of no contact between Lee and White's office after February 11, 2019); *id.,* PageID. 446 (White testified that he had no contact whatsoever with Lee between the time of her plea and sentencing other than at the bond revocation/detention hearing); *id.,* PageID. 459-62 (White's testimony that he never spoke to Lee in March, April, May—this is when Lee penned a letter to the Court— June or July to see if his client had changed her mind about the safety valve)), though he continued to represent her until withdrawing after Lee was sentenced (*see* Docs. 61 & 63 (motion to withdraw filed by White on September 13, 2019, and granted that same date by the trial judge)). On May 10, 2019, Lee filed a *pro se* letter request with the Court seeking information because she had not heard from her retained attorney since her conditions of release were revoked on February 12, 2019. (*See* Doc. 46).

> I'm writing you to ask that you help me because I have not been able to reach my lawyer Mr. White[,] John White[.] I have called him[,] my Mom ha[s] called him[,] and I have wr[itten] him letters[.] [I]t[']s like he has been avoiding me ever[] since I got locked up on Feb-12-2019[.] I haven't

spoke[n] to him[.] I don't know what's going on in my case or what's next for me[.] I'm very stressed out[.] I guess it's because I haven't paid him any more money . . . . [J]ust please if you can help me[.] . . . I don't know my other judge name[.] . . . [M]y husband and the other guy played me and they got me [into] this trouble[.] I've never been in trouble for drugs[.] I hate drugs. [P]lease[,] I need to be home with my Mom and child. My husband forced me to be around drugs[.] I feared him[.]

       To who this may concern I Lasieka Lee[,] I am a federal inmate in the Monroe County Jail[.] My lawyer is John White of Mobile Al, he is my paid lawyer[.] I haven't heard anything from him since I have been placed here [o]n Feb[.] 12[,] 2019[.] [H]e will no[t] answer my phone calls or my letters[.] I don't have any information on my case[.] I need my case information please if you can provide it for me please[.] I need my judge name for my sentencing please[.] I'm sitting in this jail not knowing anything[.] Please help me.

(*Id.*, PageID. 102-03). White in no manner responded to Lee's letter and a copy of this letter was not found in White's legal file. (Doc. 104, PageID. 390). White testified at the evidentiary hearing that he did nothing when he saw this letter because, in contrast to the contents of the letter, Lee knew exactly what was going on with her case and what remained to occur in her case (that is, sentencing). (*See* Doc. 107, PageID. 459-62). The letter, of course, does not mention safety valve relief or contain any information that Lee had changed her mind about providing information to the government. (*See* Doc. 107, PageID. 471-72; *see also id.,* PageID. 472 (White's testimony that it was Lee's decision whether to inculpate herself and that he could not force her to provide information to the government)).[10]

---

[10]    White admitted during the evidentiary hearing that it would have been his duty to provide Lee with the opportunity to make a proffer had she made the decision to disclose truthful information regarding the matters for which she had been indicted. (*See* Doc. 107, PageID. 461).

The parties agree that on June 3, 2019, United States Probation Officer Brooks interviewed Lee in the Monroe County Jail in an effort to obtain information needed to prepare the presentence investigation report ("PSR"). (Doc. 104, PageID. 390). White did not attend the interview or participate by telephone. (*Id.*). White testified at the evidentiary hearing that he did not attend this interview because he figured he could talk to Lee prior to sentencing. (*See* Doc. 107, PageID. 470).

The draft PSR, prepared on June 18, 2019, and published on June 21, 2019 (*see* Doc. 47), calculated the sentencing guidelines based upon the parties' agreed relevant conduct drug quantity (*see id.,* PageID. 111 (reflecting a base offense level of 30 because the total amount of converted drug weight [methamphetamine and cocaine] for which Lee was held responsible exceeded 1,000 kilograms)). Moreover, though the draft report reflects a two-level increase (+2) because a dangerous weapon was possessed by a coconspirator (*id.*), she was given no adjustment for acceptance of responsibility (*id.*), despite the fact that report acknowledges that Lee expressed remorse during the probation interview (*id.,* PageID. 110, ¶¶ 16-18). And, finally, the draft PSR specifically alerted the parties to the potential applicability of the safety valve at sentencing: "Pursuant to the First Step Act, the defendant appears to meet the criteria in 18 U.S.C. § 3553(f) and is eligible for Safety Valve consideration. However, there has been no corresponding emergency amendments to the guidelines to reflect the recent changes to Safety Valve, and as such, the defendant has not received the 2-level adjustment." (*Id.,* PageID. 120, ¶ 64 n.1).

Sentencing was set for July 26, 2019. (Doc. 49). The Government filed a "no objection" response to the draft PSR (*see* Doc. 48); White filed no response to the draft PSR on Lee's behalf (*see* Doc. 51 ("To date, the defendant, through counsel, has not filed objections.")).

The final PSR issued on July 15, 2019, and was filed with the Court some three days later on July 18, 2019. (Doc. 50) and was essentially the same as the draft PSR. (*Compare id. with* Doc.  47). The final PSR again noted that Lee appeared "to meet the criteria in 18 U.S.C. § 3553(f) and is eligible for Safety Valve consideration." (Doc. 50, PageID. 141, ¶ 64 n.1).

White did not send Lee a copy of either the draft or final PSR nor did he discuss either document with his client. (Doc. 104, PageID. 391; *see also* Doc. 107, PageID. 458 (White's implicit admission during the evidentiary hearing that he failed to comply with the local rule requiring him to review the PSR with his client after receipt of same)).

On July 19, 2019, defense counsel sought a continuance of sentencing due to a personal conflict (*see* Doc. 53); this motion was granted and sentencing was ultimately reset for August 9, 2019 (*see* Doc. 55). On the date set for sentencing, at 9:12 a.m., defense counsel filed a "no objection" response to the final PSR. (*See* Doc. 56 ("The Defendant has no objections to this presentence report.")).

The parties are in agreement that White never spoke with the prosecutor or otherwise sought to arrange for Lee to satisfy the requirements of 18 U.S.C. § 3553(f) by interview or written proffer. (Doc. 104, PageID. 391).

Before the sentencing hearing, White and Lee spoke briefly. (*Compare* Doc. 107, PageID. 407-08 *with id.,* PageID. 458 & 469).[11] Petitioner and her trial attorney have differing recollections of that conversation. According to White, the two spoke about the PSR, including safety valve relief, and that Lee confirmed that her position remained that she was not going to disclose any information (*see id.,* PageID. 469; *cf. id.,* PageID.457 (White's testimony that he would have "stopped the proceedings [at sentencing] if she . . . told [him] . . . [she] want[ed] to do this.")), whereas Lee testified that White told her that she was not going to get safety valve relief because she did not want to cooperate with the government and when she replied that her understanding was that all she had to do was tell the government the truth about "what happened in [her] crime[]," he told her that it was too late "in the game for that." (*Id.,* PageID. 408).

The Court essentially began the sentencing hearing on August 9, 2019, by noting the absence of any objections to the PSR and the fact that Lee did not receive "her acceptance of responsibility," (Doc. 77, PageID. 245), which prompted the following discussion:

> MR. WHITE: . . . [S]he did accept responsibility. And I did file a motion that stated no objections, but at this point I should say that there is an objection to her not receiving the acceptance of responsibility because she clearly gives it in the presentence report.
>
> THE COURT: Does she qualify for the safety valve?
>
> MS. BEDWELL: No, ma'am. Under the fifth characteristic, she did not. She's not chosen to speak to the Government.

---

[11] White admitted during the evidentiary hearing on November 5, 2020, that his "file" on Lee's case that he produced in response to the subpoena *duces tecum* served on him did not contain any notes of conversations he had with Lee. (Doc. 107*,* PageID. 463-64).

> THE COURT: All right. What's your opinion about her acceptance of responsibility?
>
> MS. BEDWELL: It was necessary to revoke the defendant from conditions of release. So we believe that is a sufficient basis from which the Court could find that she's not accepted responsibility.
>
> THE COURT: Well, I find that she's certainly accepted responsibility for her participation in selling meth. So I'm going to give her acceptance of responsibility which brings it to a level 27 and a guideline range of 87 to 108 months. That's the finding of the Court.

(*Id.*, PageID. 245-46). Thereafter, the Court heard from a witness for the Defendant (*see* Doc. 77, PageID. 247-49), defense counsel (*id.*, PageID. 250-54 (arguing that domestic violence and coercion played a role in the offense)), and Defendant Lee (*id.*, PageID. 254-55), as well as the Government (*see id.*, PageID. 255-56 (arguing that the case involved "two different types of drugs over a period of time" and that Lee had told an informant that "the source of supply for the drugs was a member of her family"[12])) regarding factors relevant to sentencing. After hearing all this information, the Court attempted to sentence Lee to a 30-month term of imprisonment (*id.,* PageID. 256-57); however, the Government objected to the sentence, contending that the minimum mandatory sentence was five (5) years (that is, 60 months) because Lee was ineligible for safety valve relief (*id.,* PageID. 257-58). Thereafter, the following discussion ensued:

> MR. WHITE: My position is she did talk to the police officers.

---

[12] This information, revealed by the government, pointed to a reason—specifically that the source of supply for the drugs was a member of her family—Lee might have been unwilling to disclose all facts necessary to qualify for safety valve relief and is certainly consistent with White's recollection that Lee did not want to pursue the safety valve at least in part because doing so would have inculpated her family (*see* Doc. 89, PageID. 314).

> THE COURT: Well, this is kind of late in the game to be telling me that because we hadn't even talked about safety valve, and when Ms. Bedwell said that she wasn't subject to the safety valve –
>
> MS. BEDWELL: Yes. We are completely unaware that she's ever made a statement to qualify for safety valve.
>
> THE COURT: Okay. Because I think an appropriate sentence would be 30 months, but if I'm required by Congress to give her 60 months, I'm gonna have to give her 60 months.
>
> MR. WHITE: Okay. Well, . . . I'm not saying that after this happened that she sat down and she spilled everything out, but when they arrested her, she did communicate with them. I mean, she did.
>
> THE COURT: Well, Ms. Bedwell has pointed out that my sentence is in error and that Congress requires me to give her 60 months because she doesn't qualify for the safety valve. So I amend my sentence to change it to 60 months, but I will state again that I believe a 30-month sentence is appropriate but because Congress requires me to give her 60 months, I'm giving her the 60 months required by Congress, but all other parts of the sentence remain in full force and effect.

(*Id.,* PageID. 258-59). Lee testified during the evidentiary hearing that she felt "bad" and "sick" upon hearing the Judge state that she thought 30 months was an appropriate sentence but she was required to sentence her to 60 months; however, she did not alert White to her feelings in that regard (Doc. 107, PageID. 420-21) and she certainly made no comment on the record during her sentencing hearing that she had informed White that she wanted to qualify for safety valve relief (*see generally* Doc. 77).

The Court entered its written judgment and statement of reasons on August 20, 2019. (Docs. 57-58). That same date, the Court received a letter from Ms. Lee (Doc. 59 (dated August 14, 2019)), which was construed by the Court as a notice of appeal (*compare* Doc. 59 *with* Doc. 60).

(Dear Judge Dubose) I'm writing to let you know that I appreciate what you tried to do for me in my sentencing but I would like to let you know what my lawyer John White was doing to me in my case. John White did not explain to me what the safety valve was. John White lead me to believe whatever the safety valve was that I was going to qualify for it the whole time that I hired him so that when I got in front of the judge that the judge can sentence[] me below the guidelines is what he told me so that's why I pled guilty and said I wanted to be sentence[d] by the judge[.] [H]e did not tell me that it had anything to do with me working with the Government. John White stated to me that he thought that it was in my best interest if I don't work with the government because I ask him would that be a good thing for me to do to help myself [and] he said no so with that being said that should let you know, [h]e did not tell me that that was the safety valve[.] [H]e did not mention safety valve and helping the government in the same situation at all. He played me and it[']s not right. I want to go back to Court to get my safety valve.

I ask Mr. White about contacting [O]fficer Mike that work with the ATF department but he never did. The whole time that I have been locked up in Monroe County [J]ail Mr. White did not come see me or contact me at all for 6 months[.] I have not had a visit or letter from my lawyer or a phone call[,] he has not call[ed] my family or nothing[.] Up until court he had me thinking that I qualify for the safety valve and I didn't and he never explained it to me. Once I got locked up for 6 months he lost[] all contact with me until the day of Aug 9th which was my sentencing date[.] [H]e was not honest with me[.] I wanted to work with the government to get my time cut to get home to my 6 year old baby[.] [P]lease help me.

.      .      .

Judge[,] I will do whatever it takes to get the safety valve[.] Mr. White did not tell me how to qualify for it and he did not stay in contact with me while I was in jail in Monroe County [J]ail. . . .

(Doc. 59, PageID. 164-66). Arthur J. Madden, III, was appointed to represent Lee on appeal on October 8, 2019. (Doc. 71). Appellant's counsel filed a brief in accordance with *Anders v. California,* 386 U.S. 738, 87 S.Ct. 1396,18 L.Ed.2d 493 (1967) and moved to withdraw from further representation of Lee. (*See* Doc. 78, PageID. 262). At the same time, the Government moved to enforce the appeal waiver contained in Lee's plea agreement. (*Id.*). A panel of the Eleventh Circuit entered a per curiam order on

March 17, 2020, granting the Government's motion to dismiss the appeal pursuant to the appeal waiver contained in Lee's plea agreement to the extent Lee sought to appeal her sentence. (*See id.*). The panel further found, upon an independent review of the record, that there existed no arguable issues of merit; therefore, appellant counsel's motion to withdraw was granted and Lee's conviction and sentence were affirmed. (*Id.*). That panel opinion issued as mandate on April 15, 2020. (Doc. 79).

On April 15, 2020, Lee filed her motion to vacate in this Court (Doc. 80) and alleges therein that her trial attorney (White) provided ineffective assistance at sentencing by failing to take the necessary steps to qualify her for 18 U.S.C. § 3553(f) safety valve relief (*compare id. with* Doc. 104, PageID. 394).

Before this matter was set down for an evidentiary hearing, Lee was granted leave to file an Affidavit Proffer under seal (*compare* Doc. 98 *with* 97-1, PageID. 360-61)[13] and testified during the evidentiary hearing that this document, executed by her on August 12, 2020, reflects what she was "prepared to tell the government back in 2019 to satisfy the safety requirements[.]" (Doc. 107, PageID. 410-11). In support of her contention that she would have given this information to the government back in 2019, Lee essentially testified that there was no one mentioned in her Affidavit Proffer she either needed or wanted to protect. (*See generally id.,* PageID. 409-12). For instance, Lee testified that the source of the drugs she delivered on two occasions in January of

---

[13]     Lee's two-page Affidavit Proffer provides additional information not set out herein because it was filed under seal.

19

2017 was her husband, who was deceased at the time of entry of her guilty plea,[14] the person she delivered the drugs to was the government's informant and a man she used to date, Shurron Fairley,[15] and her husband's source of drugs was one of her cousins, Monique Purifoy, a person with whom she did not have a good relationship.[16] (*See id.,* PageID. 409-12; *compare id. with* Doc. 97-1, PageID. 360 (in her affidavit proffer Lee explained that she did not like or trust Purifoy because she suspected that Purifoy and her husband were seeing each other after Purifoy's husband went to prison in 2016, because Purifoy would flirt with her husband in front of her, and because Purifoy was jealous of her); *cf.* Doc. 107, PageID. 411 (Lee's conclusory testimony that she would have talked to the government about the dismissed count of the indictment connected to a motel in Loxley in 2012, though no information about that incident is contained in her Affidavit Proffer)). In short, it was the thrust of Lee's testimony that she would have answered truthfully all of the government's questions about all counts set forth in the indictment returned against her because there was no one involved in these crimes whom Lee wanted (or had any inclination) to protect. (*See id.,* PageID. 409-12).[17]

---

[14]     White testified that the source of the drugs Lee delivered to the undercover agent at the rest stop was her husband, who was deceased at the time of the plea and was, therefore, someone Lee could not "hurt." (*See id.,* PageID. 455-56 & 463).

[15]     White could not recall much about the confidential informant but, ultimately, stated he believed it was someone Lee knew and agreed that she could probably not hurt that person by telling the truth. (*Id.,* PageID. 456).

[16]     White was aware that Lee's husband, in turn, received the drugs from a relative (*id.,* PageID. 463) and it "sound[ed] rigth[]" to White that Lee did not get along with this distant cousin (*see id.,* PageID. 467).

[17]     Lee offered no testimony about another one of her cousins mentioned in the Affidavit Proffer, Tiarka Stimpkins. (*Compare id. with* Doc. 97-1, PageID. 361). The gist of her (Continued)

## CONCLUSIONS OF LAW

Section 2255 reads, in relevant part, as follows: "A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a). Thus, as the language of § 2255(a) makes clear, "the grounds for collateral attack on a final judgment . . . are limited[,]" *Gayle v. United States,* 2020 WL 4339359, *3 (S.D. Fla. July 28, 2020) and are "reserved for transgressions of constitutional rights and for that narrow compass of other injury that could not have been raised in direct appeal and would, if condoned, result in a complete miscarriage of justice." *Lynn v. United States,* 365 F.3d 1225, 1232 (11th Cir.) (citations and internal quotation marks omitted), *cert. denied,* 543 U.S. 891, 125 S.Ct. 167, 160 L.Ed.2d 154 (2004). Petitioner's sole claim is that constitutionally ineffective assistance of counsel at sentencing entitles her to the relief afforded by 28 U.S.C. § 2255. (*Compare* Doc. 80 *with* Docs. 104, 110 & 112).

To establish a claim of ineffective assistance of counsel, Lee is required to show (1) that her attorney's representation/performance fell below "an objective standard of

---

Affidavit Proffer is that Stimpkins was on the fringe of the indicted crimes; however, what is missing is Lee's testimony that in 2019 she would not have hesitated in throwing this cousin under the proverbial bus and why there would have been no hesitancy in this regard. (*See* Doc. 107, PageID. 409-12).

reasonableness" and (2) that a reasonable probability exists that but for counsel's unprofessional conduct, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); *see also Jones v. United States,* 478 Fed.Appx. 536, 539-540 (11th Cir. Sept. 23, 2011) ("To make a successful claim of ineffective assistance of counsel, a defendant must show that: (1) his counsel's performance was deficient; and (2) the deficient performance prejudiced his defense.").[18] "The burden of persuasion is on a section 2255 petitioner to prove, by a preponderance of the competent evidence, both that counsel's performance was unreasonable, and that she was prejudiced by that performance." *Demar v. United States,* 228 Fed.Appx. 940, 950 (11th Cir. Jun. 21, 2007) (quotation marks, brackets and citations omitted); *see also Johnson v. Alabama*, 256 F.3d 1156, 1176 (11th Cir. 2001) ("The petitioner bears the burden of proof on the 'performance' prong as well as the 'prejudice' prong of a *Strickland* claim, and both prongs must be proved to prevail."), *cert. denied sub nom. Johnson v. Nagle*, 535 U.S. 926, 122 S.Ct. 1295, 152 L.Ed.2d 208 (2002).[19]

The performance prong of the ineffective assistance standard entails a deferential review of counsel's conduct. In assessing the reasonableness of counsel's performance, courts must indulge a strong presumption that counsel's conduct falls within the wide range of

---

[18]    "Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority." 11th Cir. R. 36-2.

[19]    It is proper in considering claims made by a federal prisoner under § 2255 to look for guidance from cases discussing claims raised by state prisoners under 28 U.S.C. § 2254. *See Hagins v. United States,* 267 F.3d 1202, 1205 (11th Cir. 2001) (citing *Holladay v. Haley*, 209 F.3d 1243 (11th Cir. 2000)), *cert. denied*, 537 U.S. 1022, 123 S.Ct. 545, 154 L.Ed.2d 432 (2002).

reasonable professional assistance.[20] Thus, the Sixth Amendment does not require criminal defense attorneys to take a nothing to lose approach and raise every available nonfrivolous defense.

With respect to prejudice, courts ask whether there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

*Means v. Sewcretary, Dep't of Corrections,* 433 Fed.Appx. 852, 855 (11th Cir. July 12, 2011) (internal quotation marks and citations omitted; footnote added); *see also Pair v. Cummins,* 373 Fed.Appx. 979, 981-982 & 982 (11th Cir. Apr. 20, 2010) ("The performance prong of an ineffective assistance claim requires the petitioner to show that, considering all the circumstances, his attorney's representation fell below an objective standard of reasonableness. The standard is that of a reasonable attorney, not a paragon of the bar or an Aristotle or a Clarence Darrow. Moreover, judicial review of an attorney's performance is highly deferential, and the court must eliminate the distorting effects of hindsight and evaluate performance from the attorney's perspective at the time the challenged conduct occurred. In so doing, the court must indulge a strong presumption that the attorney's conduct was objectively reasonable. A petitioner fails to overcome that presumption if the challenged conduct might be considered sound trial strategy. . . .  Pair must [also] establish prejudice. It is not enough for him to show that his counsel's deficient performance had some conceivable effect on the jury's verdict. Instead, Pair must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A

---

[20]    In order to satisfy the first prong, "the petitioner must establish that no competent counsel would have taken the action that his counsel did take[.]" *Hall v. Thomas,* 611 F.3d 1259, 1290 (11th Cir. 2010) (quotation marks and citation omitted).

23

reasonable probability is a probability sufficient to undermine confidence in the outcome." (internal quotation marks and citations omitted)).

Given the two-prong nature of the test for adjudicating ineffective-assistance-of-counsel claims, "'the cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between.'" *Johnson, supra,* 256 F.3d at 1176 (citation omitted); *see also Chandler v. United States,* 218 F.3d 1305, 1314 (11th Cir. 2000) (en banc) ("Given the strong presumption in favor of competence, the petitioner's burden of persuasion—though the presumption is not insurmountable—is a heavy one." (citations omitted)), *cert. denied,* 531 U.S. 1204, 121 S.Ct. 1217, 149 L.Ed.2d 129 (2001). When applying the *Strickland* standard, courts "are free to dispose of ineffectiveness claims on either of its two grounds." *Oats v. Singletary*, 141 F.3d 1018, 1023 (11th Cir. 1998) (citation omitted), *cert. denied*, 527 U.S. 1008, 119 S.Ct. 2347, 144 L.Ed.2d 243 (1999); *see also Adamson v. United States,* 288 Fed.Appx. 591, 594 (11th Cir. Jul. 29, 2008) ("The defendant must satisfy both prongs of this test to show a Sixth Amendment violation; if the defendant fails to demonstrate one of these prongs sufficiently, we do not need to address the other."), *cert. denied,* 555 U.S. 1010, 129 S.Ct. 526, 172 L.Ed.2d 385 (2008); *Butcher v. United States*, 368 F.3d 1290, 1293 (11th Cir. 2004) ("[O]nce a court decides that one of the requisite showings has not been made it need not decide whether the other one has been.").

The parties have specifically agreed in this case that "Lee would carry her burden by showing that, prior to sentencing: (1) Lee wanted to qualify for safety valve

relief and would have 'truthfully' provide[d] the United States with 'all information and evidence' she had 'concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan,' 18 U.S.C. § 3553(f)(5)[21]; and that (2) White knew of Lee's desire to qualify for safety valve or should have known of her desire to do so, and taken the necessary steps to arrange a proffer as part of the objectively reasonable course of his representation." (Doc. 104, PageID. 395 (footnote added); *see also id.* ("If Lee carries that burden, the parties further agree that the appropriate remedy would be to vacate her sentence and provide her with an opportunity to meet the safety-valve requirement in 18 U.S.C. § 3553(f)(5) prior to resentencing.")). Lee has not convinced the undersigned that prior to, or even at the time of, sentencing she wanted to qualify for safety valve relief, much less that White knew of that desire, and here is why.

The overriding impression from the evidentiary hearing, which was strengthened by a copious review of the evidentiary hearing testimony and the record in this case, is that White's representation of Lee was consistent with her desires as communicated to him and designed to achieve the best result for her in the situation (e.g., remaining on

---

[21]     *Compare, e.g., United States v. Mancilla-Ibarra,* 947 F.3d 1343, 1351 (11th Cir. 2020) ("[T]he defendant has an affirmative responsibility to truthfully disclose to the government all information and evidence that he has about the offense and all relevant conduct. . . . To satisfy this factor, [the defendant] needed to come forward and to supply truthfully to the government all the information that he possesses about his involvement in the offense, including information relating to the involvement of others and to the chain of the narcotics distribution.") (internal citations and quotation marks omitted) *with United States v. Till,* 2021 WL 28546, *2 (11th Cir. Jan. 5, 2021) ("The fifth factor under § 3553(f) makes clear that safety-valve relief applies only if not later than the time of sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan. . . . This fifth factor is a tell-all provision.") (internal citations and quotation marks omitted).

release conditions). Ms. Lee has not shown by a preponderance of the evidence that prior to, or even at the time of, sentencing she wanted to qualify for safety valve relief, much less that White knew of that desire; therefore, Mr. White did not provide constitutionally ineffective assistance as her counsel.

As with all things, it is important to start at the beginning of the legal relationship between Lee and White, December 18, 2018. On that date, Lee was represented by court-appointed counsel, Domingo Soto, and was set to enter a guilty plea on December 20, 2018. Lee, however, was unhappy with Soto's representation. And while this dissatisfaction, based on Lee's testimony, stemmed from Soto's purported refusal to show her the discovery produced by the government (principally, the video-tape discovery they had of Lee, depicting Lee's involvement in the offenses set forth in the indictment), White made clear at the evidentiary hearing that on December 18, 2018, Lee did not want to enter a plea of guilty but, instead, wanted to go to trial because of her assertion that her husband (who was then deceased) had coerced her into performing the actions for which she was indicted. So, Lee retained White on December 18, 2018, Soto filed a motion to withdraw on December 19, 2018 (advising the Court of the impending change in lawyers), and White advised the Court on December 20, 2018, that Lee would not be entering a guilty plea that day and orally requested a continuance of trial to the February 2019 term.

The undersigned finds wholly incredible Lee's evidentiary hearing testimony that she at all times wanted to enter a guilty plea[22] because, had this been the case, she would have kept Dom Soto as her attorney and entered a change of plea on December 20, 2018.[23] Stated somewhat differently, if Lee knew all along that she was going to plead guilty because she knew what she did was illegal and she was responsible for that conduct, there was no reason for her to have fired her court-appointed counsel, Dom Soto, on her first change-of-plea date and retained counsel on the basis that Soto did not allow her to review the discovery[24] (that is, the video surveillance on discs).[25] Instead, the undersigned finds credible White's testimony that on the date she retained him, Lee wanted to go to trial principally because it was her position that her husband had coerced her into performing the actions set forth in the indictment.[26] That White's testimony in this regard is credible is borne out not only by what occurred on December

---

[22]    She claims this is so because she at all times knew what she did was wrong and was going to admit to her wrongdoing.

[23]    The undersigned agrees with the government that Lee's lack of credibility in this regard casts a "long shadow over the rest of her testimony." (Doc. 111, PageID. 497).

[24]    Lee's knowledge both of the illegality of her actions and that she wanted at all times to enter a guilty plea simply does not align with the firing of Soto on the date of her change of plea.

[25]    This is true particularly in light of her testimony on cross-examination that she "just wanted to see what [she] was being charged with." (Doc. 107, Page ID. 417 ("They told me they had audio-video pictures. I just wanted to see it.")). What is clear to the undersigned, instead, is that it was not until Lee saw what was on the videotapes that she made the final determination to enter a guilty plea.

[26]    And while White was willing to take Lee's case to trial on December 18, 2018, and imparted to her that willingness, he also advised her that it may turn out to be in her best interests to plead guilty.

18-20, 2018, as set forth above, but, as well, by Lee's continued insistence, even after entry of her guilty plea, that her deceased husband was to blame for her running afoul of federal drug laws (*see* Doc. 46, PageID. 102 ("[M]y husband and the other guy played me and they got me [in] this trouble[.] I'v[e] never been in trouble for drugs[.] I hate drugs. . . . My husband forced me to be around drugs[.] I fear[e]d him[.]")).

The next court appearance for White after December 20, 2018, was on January 8, 2019, a date set by order (*see* Doc. 24) after the Court granted White's oral motion to continue trial to the February 2019 term (*see* Doc. 23). At the pretrial conference, White informed the undersigned, consistent with Lee's wishes, that her case needed to be set for trial. Again, the undersigned finds credible White's testimony that he told Lee to consider pleading guilty but that he would take her case to trial if that was her decision and that, as of January 8, 2019, Lee's instructions remained that she wanted a trial. Instead of setting the matter down for trial, however, the undersigned set a supplemental pretrial conference date for January 11, 2019 (*see* Doc. 26). Lee and White met with United States Probation Office Mark Seibert before the conference; Seibert advised them that Lee was eligible for safety valve relief and White acknowledged during the hearing that in order to qualify for safety valve relief, Lee would have to provide truthful and complete information to the government and that the defense would need time to do that, prompting the Court to observe that if the only issue was Lee truthfully disclosing complete information to the government, her change of plea could be set in late January of 2019. And when the prosecutor added that the government would not interview Lee until after the guilty plea, given the possibility of

the plea falling through and the fact that she had up until sentencing to provide truthful and complete information in order to qualify for the safety valve, the change of plea hearing was set for January 25, 2019.

The government had no interest in interviewing Lee until after the change-of-plea because the plea might fall through, as it had before. Moreover, the prosecutor further recognized that the government would not oppose Lee's continued release following entry of her guilty plea, in light of the agreement to "***attempt***" to cooperate with the government. (*See* Doc. 104, PageID. 385-86). Thus, the undersigned finds nothing inconsistent or incredible about White's evidentiary hearing testimony that Lee was still on the fence about pleading guilty at this point in time (and, certainly, therefore, he had heard nothing from Lee explicitly informing him that she was ready to provide truthful and complete information to the government to qualify for safety valve relief) because, in the prosecutor's own words, it was certainly not a "done deal" either that Lee would enter a guilty plea or that Lee would disclose information to the government that would qualify her for safety valve relief. Of necessity, a lot of posturing goes on between the United States and defense counsel during pretrial conferences and other hearings and the attorneys really do not have a good idea where the cases are headed (particularly, trial versus plea) until the Defendant cuts that card (and signs a plea agreement), along with other related cards.

Two days before the change-of-plea hearing, on January 23, 2019, Lee went to White's office and, for the first time, viewed the video evidence of her involvement in at least some of the crimes set forth in the indictment. White arrived in his office at the

tail-end of Lee's review of the video evidence and testified that Lee seeing herself on videotape is what convinced his client to change her plea to guilty instead of going to trial, as she had previously insisted. That the video surveillance was the clinching factor in Lee's calculus to plead guilty is patently credible. And that, on this date, safety valve relief was again discussed with Lee is clear not just from White's evidentiary hearing testimony but, as well, from the testimony of White's legal assistant, Zoe Steadham. White stressed that Lee would have to disclose all information related to the crimes set forth in the indictment, including information relating to the involvement of others. Lee immediately informed White that she would not disclose such information; however, White urged Lee to sleep on it and contact him the following day. That this testimony by White is credible is clear based on Lee's call to White's office on January 24, 2019 and her message that she would speak to White before her change of plea.

Before the proceeding began on January 25, 2019, Lee again informed White that she would not disclose the information needed to satisfy the fifth requirement of § 3553(f), though it is clear from White's credible testimony that Lee understood that if she did not disclose the information she likely was going to be sentenced to the statutory minimum mandatory. And, indeed, during the change-of-plea hearing, Lee specifically acknowledged her understanding that the penalties involved included a statutory minimum mandatory of 5 years (that is, 60 months) and, as well, advised the Court that she was satisfied with the counsel, advice and representation of White. Moreover, it is clear that the factual resume, which Lee executed and acknowledged she read, included events not only regarding her methamphetamine-related conduct in

2017 but, as well, it included events in 2012 relating to Count One, charging her with possessing with intent to distribute 172.92 grams of cocaine.

The record is clear that after entry of the plea, the parties asked the undersigned to allow Lee to remain on release, in order to facilitate her cooperation with the government. White's comment to the Court that the parties had "talked," after the prosecutor advised the undersigned that Lee's agreement to cooperate established circumstances allowing her to remain on conditions of release, certainly does not constitute a false statement of material fact. *See* Ala.R.Prof.Conduct 3.3(a)(1) (providing that a lawyer shall not knowingly make a false statement of material fact or law to any court). In addition, it certainly does not constitute an agreement (or even a suggestion) that Lee would disclose the information necessary to meet the fifth requirement of § 3553(f). Instead, the undersigned agrees with White that any statement he made in connection with maintaining Lee on release was appropriate in order to leave the door open for her to change her mind about disclosing information to the government. Moreover, there is nothing to suggest that the government had any stronger belief that Lee was going to be able to disclose information successfully to it on January 25, 2019, than it had on January 11, 2019, a date upon which the government knew only that Lee might attempt to cooperate and disclose such information for safety valve qualification or for substantial assistance/downward departure purposes. In other words, Lee's disclosure of information was not a "done deal" on January 25, 2019, any more than it was on January 11, 2019, and the simple fact that the government was willing to allow Lee to remain released on conditions to facilitate disclosure of such information (and

any related comments by White) does not establish otherwise. Indeed, the undersigned finds credible White's testimony that, on this date, Lee had decided not to disclose this information to the government despite understanding that she likely would receive the statutory minimum mandatory of 60 months unless she qualified for safety valve relief. Safety valve relief had been sufficiently explained to Lee, first by Seibert and then by White, for Lee to make an informed decision about whether to disclose information to the government, in order to receive a sentence reduction, as opposed to the near surety of a 60-month statutory sentence at least, and Lee left White after that proceeding with the knowledge that she would not disclose any information to the government. *See* Ala.R.Prof.Conduct 1.4(a).

Two days after entry of her guilty plea, Lee was arrested in Pensacola and charged with DUI and operating a motor vehicle with a suspended driver's license. She made bond on that case but her arrest, and subsequent failure to report her arrest to her pretrial services officer, led to a bond revocation proceeding on February 12, 2019. During that proceeding, White certainly stated that he thought Lee had a shot at being a good candidate for safety valve relief, although it would be harder for her after her arrest, and simply asked that she be subject to stricter conditions; however, again, this Court finds White credible that those statements were made in an effort to keep Lee from being detained and to keep the door open should Lee change her mind about qualifying for safety valve relief.[27] The undersigned also believes White's evidentiary

---

[27] The comments White made at the bond revocation/detention hearing and during the change of plea are reflective of his spontaneous and reactive approach to the practice of criminal law, taken with an eye toward getting the most favorable relief for his client, as they (Continued)

hearing testimony that in her direct communications to him on February 12, 2019, she remained resolute that she would not disclose any information to the government in accordance with § 3553(f)(5).

The government appealed the order of the Magistrate Judge and the Court, of course, entered two orders on February 13, 2019; the first order accepted Lee's plea of guilty of Count 4 of the Indictment, pursuant to the Magistrate Judge's report and recommendation, and adjudged her guilty of that offense (Doc. 44), and the second revoked Lee's pretrial release status in light of her conviction (*see* Doc. 45).

Lee was detained in the Conecuh County Jail from February 12, 2019 through to her sentencing on August 9, 2019. During this six-month timeframe, White never had any communication (written or oral) with Lee. This was so even though Lee wrote a letter to this Court containing the statement that White had not communicated with her despite the letters and phone calls made by her to him, she was unaware of what was going on with her case, and what was next for her. (*See* Doc. 46, PageID. 102-03). While there can be little question but that a lawyer has a duty to keep his client reasonably informed about the status of her case, Ala.R.Prof.Conduct 1.4(a), and the record in this

came immediately in response to the prosecutor's argument that Lee's DUI arrest (and, obviously, her subsequent failure to report the arrest) impacted her viability as a credible witness. In this instance, the relief sought by White was to have Lee remain on release (on stricter conditions) until her sentencing and his arguments worked, at least with respect to the Magistrate Judge, who ordered Lee released on stricter conditions. Moreover, his comments are not exact enough to constitute a representation (or misrepresentation) that Lee had agreed to disclose information to the government in order to "qualify" for safety valve relief. Besides, given that the government was already raising questions about her credibility, White's evidentiary hearing testimony that Lee remained resolute at this point in time that she was not going to disclose any information to the government is, itself, entirely credible.

case certainly would have been clearer (and cleaner) had White communicated with Lee after the docketing of this letter, again the undersigned finds credible White's testimony that Lee knew exactly what was going on in her case. Indeed, Lee's own letter betrays her, as she clearly recognized that the only step left in her case was her sentencing. (*See* Doc. 46, PageID. 103). Moreover, that Lee fails to make any mention of safety valve relief in her letter (or that she anticipated an opportunity to provide information to the government) speaks volumes not simply for her disinclination to disclose any information to the government but, as well, for her recognition that only step that remained in her case was sentencing.

The next time Lee was in this Court was for her sentencing on August 9, 2019. Before sentencing, White and Lee discussed the PSR for the first time, in contravention of the contents of this Court's Criminal Local Rule 32(b)(2), which requires defense counsel to "discuss the contents of the PSR with the Defendant prior to filing his or her position with respect to sentencing factors." S.D. Ala. CrLR 32(b)(2). And while it is clear that White misstepped in this regard, that misstep does not lead this Court down a path to ineffective assistance of counsel because the undersigned finds credible White's evidentiary hearing testimony that when the subject of safety valve arose during this meeting, Lee confirmed what she had said all along, that she would not disclose any information to the government relative to the indictment.[28] The

---

[28] To be sure, White's testimony in this regard came on cross-examination. However, the undersigned credits this testimony over his testimony on direct examination that he could not specifically recall the contents of his discussion with Lee prior to sentencing regarding the safety valve (*see* Doc. 107, PageID. 446-47). The undersigned credits White's testimony on cross-examination in part given the witness' direct testimony that he knew that (Continued)

undersigned also believes White's testimony that he would have taken any action possible to stop the sentencing had he any inkling that Lee had changed her mind and wished to qualify for safety valve relief by disclosing truthful information to the government. This testimony is credible because it is true to White's spontaneous nature and willingness to act in the best interests of his client. Similarly, when Judge DuBose informed Lee that her sentence would have been 30 months instead of the mandatory minimum of 60 months had she qualified for safety valve relief, and despite White knowing all along that Lee expressed no interest in qualifying for safety valve relief, he nonetheless gave the proverbial "college try" of arguing that while Lee had not sat down and "spill[ed] everything," she did communicate with police officers when she was arrested. Again, this action by White tells the undersigned that he would have told this Court the truth and testified at the evidentiary hearing that Lee wanted to qualify for safety valve relief and that he failed to draft a proffer, had this in fact been the truth.

The undersigned would be remiss in failing to point out that Lee offers nothing (beyond her proffer affidavit) to buttress her evidentiary hearing testimony that she told White essentially from January 11, 2019 onward that she wanted to qualify for safety valve relief and that she would disclose all information to the government. In particular, though Lee mentions the fact that her mother attempted to contact White, and that her mother had spoken to White before and was in his office when her daughter retained him, her mother was not called as a witness during the evidentiary hearing. Certainly, if

they discussed safety valve before sentencing but also because it was apparent that the more White was questioned about this conversation, the more he remembered the conversation.

anyone else knew about Lee's desire to qualify for safety valve relief, it would have

been her mother. Moreover, Lee offers no proof that she wrote to White (specifically

raising her desire for safety valve relief) while she was incarcerated in the Conecuh

County Jail, and the records from White do not reflect such correspondence, though

Lee testified that she wrote numerous letters to White. And, perhaps most telling, Lee's

letter to the Court in May of 2019 makes no mention of safety valve relief which, if her

evidentiary testimony were to be believed (which it is not), was paramount in her

mind.[29] Instead, what Lee has now attempted to do in support of her position that she

wanted to qualify for safety valve relief from the moment she heard about it (or at least

at some unidentified date between February 12, 2019 and August 9, 2019[30]) is to

produce a proffer affidavit containing all the information she claims exists regarding the

---

[29]     As well, Lee certainly did not advise the Court at sentencing that she wanted to qualify for safety valve relief all along and that it was White who failed to take the steps necessary to ensure she was sentenced in accordance with § 3553(f). And, finally, the contents of Lee's post-sentencing letter to the Court (dated August 14, 2019, and construed as a notice of appeal)—specifically that White never explained safety valve to her, never told her it had anything to do with the government, and never told her how to qualify for it (see Doc. 59)—have been eviscerated not simply by various hearing transcripts of record (in particular, the pretrial conference on January 11, 2019 and the bond revocation hearing on February 12, 2019, both of which Lee attended) but, as well, the evidentiary hearing testimony of White, Steadham, and even Lee herself (see Doc. 107, PageID. 406 ("He told me that I had to tell the government what I did, truthfully.")). At the same time, the undersigned views Lee's letter as containing a backhanded admission that she never informed White that she wanted to qualify for safety valve relief by truthfully providing information about her crimes to the government.

[30]     Part of the problem with accepting any of Lee's testimony is her rigid adherence to the idea that she never wavered from wanting to qualify for safety valve relief from the moment she learned about it on January 11, 2019, when it is abundantly clear that she consistently informed White in January of 2019 that she was not going to disclose information to the government about her involvement (and the involvement of others) in the offenses contained in the indictment. Therefore, this "assumption" that Lee must have changed her mind while she was locked up in the Conecuh County Jail cannot withstand scrutiny without having as a foundation Lee's own testimony that she had a change of heart, testimony that nowhere appears in the evidentiary hearing transcript.

2017 "counts" in her indictment and her otherwise uncorroborated assertion that she long ago would have willingly provided this information because there was no person who she wanted to protect. Even if the unreliability of Lee's testimony, as previously detailed, was not enough alone to question the veracity of Lee's testimony in this regard, the undersigned would still find this testimony unconvincing. In her evidentiary hearing testimony, Lee testified in a very conclusory manner that she had no problem divulging Monique Purifoy as her husband's drug source because she did not get along with Purifoy, though they are related (they are cousins). However, Lee offered no explanation of why the two cousins did not get along and it takes a reading of the affidavit proffer to get an inkling that Lee's purported dislike and mistrust of Purifoy stemmed from her belief that Purifoy and her husband were seeing each other when Purifoy's husband went to prison in 2016, that Purifoy would flirt with her husband in front of her, and that Purifoy was jealous of her. Lee's testimony and accompanying affidavit statements, however, do not ring true to the undersigned. This is both because Lee herself was "seeing" Fairley (the confidential informant) while her husband was imprisoned and because Lee purportedly was in such fear of her husband that she did whatever he wanted respecting the drug activity set forth in the indictment. In other words, given Lee's own relationship with the confidential informant and her husband's horrid treatment of her (certainly, nothing for Purifoy to be jealous of), it would appear to the undersigned that Lee would have welcomed (and even encouraged) the attention her cousin purportedly lavished on her husband rather than resenting this attention to the degree that she would willingly supply information about her cousin to

the government. In addition, Lee offers no explanation for why she would have willingly relayed information to the government about another cousin, Tiarka Stimkins, at any time before the sentencing hearing. Thus, the undersigned questions whether Lee was prepared to divulge all truthful information regarding the involvement of others at any time before she was sentenced. Moreover, because Lee only offered the conclusory evidentiary hearing testimony that she would supply information about her 2012 cocaine conduct but did not supply any direct testimony about what such conduct was or who else was involved, nor does her affidavit proffer contain any such information, any suggestion that she would have truthfully disclosed all such information is without foundation. *Cf. Rios v. United States,* 228 Fed.Appx. 629, 632 (8th Cir. Apr. 26, 2007) (finding that counsel was not constitutionally deficient in failing to inform his client of his eligibility for safety-valve reduction because counsel reasonably could have determined, based upon his client's testimony at trial, that his client could not successfully fulfill the requirement that he provide a truthful proffer).

The undersigned finds that what is happening here is nothing more than Lee's post-hoc attempt to blame someone other than herself for the sentence she finds herself serving.[31] This desire to shift blame is not surprising because Lee consistently blamed her husband for the crimes for which she was indicted. Indeed, she initially wanted to go to trial and defend claiming that her husband coerced her into the conduct

---

[31]     Of course, as previously touched upon, this attempt is made even more suspect given that there existed no reason for White not to explore safety valve relief for Lee, if she had truly wanted to chart that route, since he had successfully shepherded clients through the safety valve before representing Lee.

set forth by indictment, only to realize this strategy would not serve her well when she saw herself on tape. So, she did indeed enter a guilty plea to one count of the indictment but even after doing so she continued to blame not only her husband but the confidential informant too (Doc. 46, PageID. 102), rather than herself. Therefore, it should come as no surprise to anyone, certainly not John White, that once Lee digested that her sentence would have been 30 months (as opposed to the 60-month mandatory minimum) had she qualified for safety valve relief, she would lay blame for her sentence on someone other than herself. And, thus, Lee has blamed White for purportedly failing to ensure that she qualified for safety valve relief, instead of admitting that she alone need take credit for her sentence since she alone told White that she would not disclose all information necessary to satisfy the fifth requirement of § 3553(f).

Based upon all of the foregoing, the undersigned finds that Lee's motion to vacate, based solely on ineffective assistance of counsel, should be denied because she has not shown by a preponderance of the evidence that she wanted to qualify for safety valve relief and would have 'truthfully' provide[d] the United States with 'all information and evidence' she had 'concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan,' 18 U.S.C. § 3553(f)(5), and that White knew of her desire to qualify for safety valve relief.

The Magistrate Judge recommends that the Court deny Lee's motion to vacate, set aside or correct his sentence under 28 U.S.C. § 2255. Moreover, pursuant to Rule 11(a) of the Rules Governing § 2255 Proceedings, the undersigned recommends that a

certificate of appealability in this case be denied. 28 U.S.C. foll. § 2255, Rule 11(a) ("The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."). The habeas corpus statute makes clear that an applicant is entitled to appeal a district court's denial of his habeas corpus petition only where a circuit justice or judge issues a certificate of appealability. 28 U.S.C. § 2253(c)(1). A certificate of appealability may issue only where "the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2243(c)(2). Here, Lee's habeas petition is being denied solely on the merits, such that a COA should issue only when the Petitioner demonstrates "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S.Ct. 1595, 1604, 146 L.Ed.2d 542 (2000); *see also id.* at 483-484, 120 S.Ct. at 1603-1604 ("To obtain a COA under § 2253(c), a habeas prisoner must make a substantial showing of the denial of a constitutional right, a demonstration that, under *Barefoot*, includes showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'"); *see Miller-El v. Cockrell*, 537 U.S. 322, 336, 123 S.Ct. 1029, 1039, 154 L.Ed.2d 931 (2003) ("Under the controlling standard, a petitioner must 'sho[w] that reasonable jurists could debate whether  (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were "adequate to deserve encouragement to proceed further."'"). With respect to Lee's ineffective assistance of counsel claim, it is recommended that the

Court find that reasonable jurists could not debate whether Lee's § 2255 habeas petition should be resolved in a different manner or that the issues presented are adequate to deserve encouragement to proceed further. Accordingly, Petitioner is not entitled to a certificate of appealability with respect to any of his claims.

Rule 11(a) further provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." If there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation. *Brightwell v. Patterson,* CA 11-0165-WS-C, Doc. 14 (Eleventh Circuit order denying petitioner's motions for a COA and to appeal IFP in a case in which this Court set out the foregoing procedure); *see also Castrejon v. United States,* 2011 WL 3241817, *20 (S.D. Ala. Jun. 28, 2011) (providing for the same procedure), *report and recommendation adopted,* 2011 WL 3241580 (S.D. Ala. Jul. 29, 2011); *Griffin v. DeRosa*, 2010 WL 3943702, at *4 (N.D. Fla. Sept. 20, 2010) (providing for same procedure), *report and recommendation adopted sub nom. Griffin v. Butterworth,* 2010 WL 3943699 (N.D.Fla. Oct. 5, 2010).

## CONCLUSION

The Magistrate Judge is of the opinion that Lasieka Jauwane Lee's rights were not violated in this cause and that her request to vacate, set aside or correct his sentence (Doc. 80) should be **DENIED**. Petitioner is not entitled to a certificate of appealability and, therefore, she is not entitled to appeal *in forma pauperis*.

**NOTICE OF RIGHT TO FILE OBJECTIONS**

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court. *See* 28 U.S.C. § 636(b)(1); FED.R.CIV.P. 72(b); S.D. Ala. GenLR 72(c)(1) & (2). The parties should note that under Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice." 11th Cir. R. 3-1. In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

**DONE** this the 25th day of February, 2021.

        s/P. Bradley Murray       
**UNITED STATES MAGISTRATE JUDGE**